IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

JANICE R. McCLANAHAN )
)
v. ) No. 2:07-0005
) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:     The Honorable John T. Nixon, Senior Judge

REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, as provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded (Docket Entry No. 23); plaintiff has further filed a reply (Docket Entry No. 24) to defendant's response. Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11; referred to hereinafter as "Tr."), and for the reasons given below, the undersigned recommends that plaintiff's motion be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

I. Procedural History

Plaintiff filed her DIB and SSI applications on December 30, 2002, alleging

1

disability commencing July 1, 2001, due to left shoulder injury, back pain, nerve problems, migraine headaches, and depression (Tr. 34, 65-67, 76, 193, 329-41). Plaintiff's applications were denied initially by the state agency designee of the SSA (Tr. 33-34, 37-40, 342-43, 344-47), and then again upon reconsideration by that agency (Tr. 35-36, 45-46). Plaintiff thereafter requested a *de novo* hearing before an Administrative Law Judge ("ALJ"), and on March 3, 2005, plaintiff's case was heard (Tr. 420-51). Plaintiff was represented by counsel at the ALJ hearing, and testimony was received from plaintiff and from an impartial vocational expert. At the conclusion of the hearing, the ALJ closed the record and took the case under advisement.

On September 2, 2005, the ALJ issued a written decision in which it was determined that plaintiff was not disabled (Tr. 17-25). The decision contains the following enumerated findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.[1]

3. The claimant's depression and left arm impairment are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

---

[1]This alleged onset date is July 1, 2001, and there was no amendment to this date despite what appears to be uncontradicted evidence that plaintiff last performed substantial gainful activity on June 15, 2002, as an assembly line worker for a company named Flextronics (Tr. 85, 90, 426-27).

2

Case 2:07-cv-00005   Document 25   Filed 10/31/08   Page 2 of 20 PageID #: 90

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: lift/carry 10 pounds frequently/20 pounds maximum occasionally, with occasional postural activity such as stooping, kneeling, balancing and crouching but no crawling and no climbing ladders, ropes and scaffolds, occasional pushing/pulling bilaterally with the lower extremities, frequent ability to reach with the left arm but occasional reaching overhead, and can perform simple, routine, repetitive work away from the general public.

7.  The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.  The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

9.  The claimant has a GED degree, which is equivalent to a high school education (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light and sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.20 and 202.13 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include: (at the light level of exertion) assembler, 11,500 jobs in the regional economy of Tennessee/336,000 jobs in the national economy; hand packer, 5,500 jobs in the region/195,000 jobs in the nation; and information clerk, 1,250 jobs in the region/30,500 jobs in the nation; and (at the sedentary level) assembler, 5,400 jobs in the regional economy of Tennessee/150,000 jobs in the national economy; information clerk, 1,600 jobs in the region/42,700 jobs in the nation; and office clerk, 1,020 jobs in the region/57,000 jobs in the nation.

13. The claimant was not under a "disability," as defined in the Social Security

Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 24-25)

By notice dated December 18, 2006, the Administration's Appeals Council declined to assume jurisdiction over the case, and noted that the ALJ's decision thus stood as the Administration's final decision. (Tr. 6-8) This action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

Born in 1955, plaintiff was fifty years old at the time the ALJ's decision issued, with a high school equivalency education and past relevant work as an assembler and general laborer. (E.g., Tr. 424, 444)

**Medical Proof.** The medical evidence in this case begins with records predating plaintiff's alleged onset date of July 1, 2001, from the Trousdale Medical Center Emergency Room, the staff of which administered conservative treatment with medications for plaintiff's complaints of vascular and migraine headaches, asthma, leg swelling, and abdominal, hip, and lower back pain (Tr. 135-66). In May and June of 2002, respectively, plaintiff was treated in the Emergency Department of the University Medical Center for complaints of pain in her left arm and dizziness, resulting in a diagnosis of chest wall pain (Tr. 179-90), and for complaints of left ankle pain after stepping in a hole, resulting in a diagnosis of left ankle strain (Tr. 167-78).

At all relevant times, plaintiff has been under the primary care of Dr. Floyd
4

Reed, who had established prescriptions for medications including the nonsteroidal anti-inflammatory Celebrex for treatment of plaintiff's musculoskeletal complaints, Theophylline for plaintiff's asthma, and Prozac for the stabilization of plaintiff's mood, prior to plaintiff's alleged disability onset. (Tr. 154) Dr. Reed submitted a form to the state agency in January 2003 reflecting his belief that plaintiff had only minor difficulties with mood disturbance, as she was not felt to have an underlying mental disorder, nor had any referral for mental health treatment been required. (Tr. 132) Thereafter, plaintiff's mental health and corresponding limitations of function were evaluated by a nonexamining state agency consultant (Tr. 201-14), a government consultative examiner (Tr. 193-97), and a psychologist consulted by plaintiff's attorney (Tr. 270-74).[2]

On February 3, 2003, plaintiff was examined by a government consultant, Dr. Albert Gomez (Tr. 198-200). Plaintiff reported to Dr. Gomez that she had a history of pain in her lower back, left shoulder, both knees, and her left ankle (Tr. 198). She reported smoking two packs of cigarettes daily, as well as smoking marijuana daily for pain relief (Tr. 199). Physical examination was essentially normal; Dr. Gomez noted that plaintiff ambulated with a mild limp but did not use any assistive walking device, that she could get on and off the examination table with some difficulty, that she had full range of motion in both shoulders, elbows, wrists, hips, knees, and ankles with some decrease in flexion, that her grip strength and motor strength in all extremities was normal, and that straight leg raise

---

[2]The reports of these examiners, together with the submission from Dr. Reed and the testimony of plaintiff, informed the ALJ's findings that plaintiff's depression was a "severe" impairment under the regulations, but one which only resulted in restrictions against more than "simple, routine, repetitive work" not involving contact with the general public (Tr. 18, 22). Plaintiff does not assert any challenge to the ALJ's findings with regard to her depression or work-related limitations of mental function.

5

testing produced negative results. (Tr. 199-200) Additionally, Dr. Gomez noted moderate tenderness to palpation of the lumbar spine with some decrease in range of motion, but further noted the absence of any neurological deficits. (Tr. 200) Plaintiff could tandem walk, but could not heel/toe walk or squat. Id. Dr. Gomez opined that plaintiff had chronic low back pain, shoulder pain, knee pain, ankle pain, and degenerative joint disease, along with obesity and marijuana abuse; she was felt capable of doing light work with normal breaks. Id. Within the same month as this consultative examination, a nonexamining state agency consultant essentially concurred with the assessment of light work capability by Dr. Gomez (Tr. 215-22).

In May and June of 2003, plaintiff was seen by Dr. Reed for complaints of lower back pain evidently exacerbated by a coughing spell (Tr. 292). Plaintiff was also noted to have swelling in both lower extremities related to fluid retention (Tr. 291, 292). Plaintiff's back pain was treated with a therapeutic injection of the narcotic Toradol, followed by a short course of the oral narcotic Lortab (Tr. 292). The fluid retention was addressed with a prescription for Lasix; it is also noted that plaintiff was given a month's supply in samples of Avandamet, a medication for type 2 (non-insulin-dependent) diabetes mellitus. (Tr. 291)

In early June of 2004, plaintiff complained of chest pain and was briefly hospitalized for cardiac and upper abdominal workup (Tr. 293, 302-05, 307-09). After visiting Dr. Reed on June 24, 2004, when she complained of, *inter alia*, abdominal discomfort and frequent chest pain with shortness of breath (Tr. 289), plaintiff was sent for further evaluation of these complaints in late June and July of 2004, including by cardiac catheterization and echocardiogram (Tr. 294, 306), with negative or inconclusive results. (Tr. 287-90, 294-301, 306) In followup with Dr. Reed during these months, plaintiff was

6

Case 2:07-cv-00005   Document 25   Filed 10/31/08   Page 6 of 20 PageID #: 94

diagnosed with gastroesophageal reflux disease, non-insulin-dependent diabetes mellitus, pedal edema, chest wall pain, osteoarthritis, obesity, and depression (Tr. 287-88). Plaintiff was further seen by Dr. Reed in August, September, and October of 2004, when she complained of back, knee, and head pain; plaintiff's musculoskeletal pain was treated with Lortab, while her headache was treated with an injection of medication. (Tr. 284-85) Between July and September 2004, plaintiff was seen in the Trousdale emergency room three times for migraine headaches (Tr. 228-29, 230-31, 234-36) and once for back pain (Tr. 232-33). These records reveal that plaintiff's complaints were treated with injections of medication, and the records further make note of plaintiff's history of frequent visits to the emergency room for such exacerbations of head and back pain. Id.

In October 2004, Dr. Reed ordered an orthopedic referral in response to what was assessed as degenerative joint disease in plaintiff's knees; an appointment was made for plaintiff to see Dr. Roy Terry on November 2, 2004. (Tr. 284) Meanwhile, on October 29, 2004, plaintiff returned to Trousdale with complaints of left leg pain from a fall (Tr. 224-27). On exam, only mild swelling of the left ankle was noted (Tr. 225). However, x-rays of the left leg and knee revealed that plaintiff had suffered a nondisplaced fracture of the fibula near the knee joint (Tr. 225-27). Plaintiff's leg was placed in an immobilizer (Tr. 225), but she was ambulatory at discharge with a walker, was noted to be ambulating without distress and with good balance, and stated that she felt much better (Tr. 224).

On November 2, 2004, plaintiff presented for her appointment with Dr. Terry regarding her orthopedic impairments (Tr. 281-82). X-rays showed her fibula fracture and some bone-on-bone changes on the medial aspect of the left knee, with no significant spur formation (Tr. 281). Examination revealed no bruising, swelling, atrophy, neurologic or

7

Case 2:07-cv-00005   Document 25   Filed 10/31/08   Page 7 of 20 PageID #: 95

pulse deficits, motion problems, or evidence of radicular symptoms (Tr. 282). Regarding plaintiff's left shoulder, Dr. Terry noted no bruising or swelling, but good motion with a mild impingement sign; an MRI confirmed what appeared to be impingement, but no obvious tear (Tr. 276, 279, 280, 282). An MRI of plaintiff's right knee showed considerable edema but no definite injury (Tr. 277, 280), and the left knee was shown to be normal (Tr. 278, 280). Dr. Terry recommended a course of physical therapy (Tr. 280).

On December 3, 2004, Dr. Reed's office completed a statement regarding plaintiff's ability to do work-related activities (Tr. 311-14). Dr. Reed opined that plaintiff had degenerative joint disease in both knees and her lower spine, as well as anxiety, and that her prognosis was fair to poor (Tr. 311). Dr. Reed noted that plaintiff's symptoms were pain in her knees and back, pedal edema, shortness of breath, fatigue, drowsiness and somnolence. Id. The clinical findings identified as consistent with these symptoms included 3+ pitting edema in both legs, obesity, crepitus, and bulging disks; it was also noted that some of plaintiff's prescription medications may cause drowsiness. Id. Dr. Reed indicated that plaintiff suffered vascular, migraine headaches and associated symptoms approximately once per week, lasting approximately one hour and relieved by rest and darkness (Tr. 311-12). Considering this combination of impairments, Dr. Reed assessed plaintiff to be severely limited in her ability to perform a number of work-related forms of exertion, and indicated that this level of impairment had persisted since 1997. (Tr. 313-14)

Plaintiff returned to the Trousdale emergency room in late December of 2004, complaining of an exacerbation of lower back pain as a result of moving boxes (Tr. 325-28). It was noted that plaintiff did not display any radiation or focal weakness, and that the pain felt like one of her "usual" exacerbations (Tr. 327). It was further recorded that plaintiff

8

wanted a refill of her hydrocodone prescription, though the Trousdale records reflect only the one-time injection of narcotic medication before her discharge in stable condition. Id. Plaintiff experienced a similar episode a month later, when plaintiff described what felt like her usual back pain flare-up to the Trousdale staff (Tr. 322-24). It was noted that a Trousdale physician had in the past determined that no surgery was indicated for plaintiff's back impairment (Tr. 324).

In January 2005, plaintiff was seen in Dr. Reed's office, where she was assessed with bilateral knee pain from degenerative joint disease, and her prescription for Lortab was increased to three times per day. (Tr. 317)[3] She returned to Dr. Reed on February 1, 2005, again complaining of lower back pain. She was given an injection of medication, and an MRI of her lumbar spine was ordered. (Tr. 316) This MRI resulted in the following findings: "1) Multiple level spinal stenosis with mild canal narrowing in the lower lumbar spine. 2) At the L5-S1 level there is asymmetric right lateral disc protrusion resulting in inferior encroachment upon the neural foramen." (Tr. 319)

No further medical evidence was included in the record before the ALJ.

**Testimonial Proof.** The ALJ summarized plaintiff's hearing testimony as follows:

> The claimant testified that she has experienced worsening pain in her low back, left shoulder, knees and ankles. She described having constant pain, exacerbated by changes in the weather. She takes generic Hydrocodone medication and also Percocet for pain relief. Her medications cause side effect of drowsiness. She also may ... use a heat pad and take a soak in the bathtub. She can not lift and she has trouble climbing stairs and walking. She can not pick up objects from the floor or stoop, and her feet swell and she has trouble

---

[3]Though this treatment note bears the date "1-6-04," it is clear from its placement in the record and its indication of plaintiff's age (49) at the time of treatment that this note actually refers to plaintiff's visit on January 6, 2005.

getting her shoes on. She has trouble reaching over the shoulder level and trouble gripping with her left hand. She has difficulty showering. She estimated that she can stand no more than 10-15 minutes at a time and no more than 40 minutes in an eight-hour workday. She reported that she broke her left leg in December 2004 after falling down and wore a brace afterward. She stated that she can sit upright for only 10-15 minutes and she sits in a reclined position all day. She stated that she generally feels useless. She cooks but engages in few other activities around the house. She occasionally cries and also may get angry, and she feels that she can not handle stress. She continues to take Prozac on a daily basis.

(Tr. 20)

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits

10

by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

11

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff's two principal arguments are (1) that the ALJ erred in discounting the assessment of her treating physician, Dr. Reed, in favor of the assessment of the consultative examiner, Dr. Gomez, and (2) that the ALJ erred in discounting her credibility without giving due weight to factors which tend to support her complaints. The undersigned will address these arguments in turn.

(1)

12

Regarding the ALJ's weighing of the medical opinion evidence, the following rationale is given at page five of the ALJ's decision:

> In concluding that the claimant could perform light lifting, Dr. Gomez took into consideration the claimant's alleged chronic pain of the low back, knees, ankles and shoulders as well as her obese weight, which may contribute to the aforementioned problems. The claimant's treating physician, Dr. Floyd Reed, opined as of December 3, 2004 that the claimant had a greater degree of functional limitation, with essentially no ability to lift or perform any postural activity due to her multiple impairments (Exhibit 14F, p.5). However, I afford this opinion little weight because I find that it is poorly supported by objective medical findings and inconsistent with the weight of the medical evidence, as required by 20 CFR 404.1527(d)(2). Dr. Reed reported that the claimant had leg edema, obesity, crepitus and bulging disks, however he offers no further descriptive evaluation of the nature and severity of the claimant's impairments, nor document[s] the degree or frequency of the above findings. Again, he did not commence seeing the claimant on a regular (monthly) basis until June 2004 - well after her alleged onset date - and prior to that he saw her only infrequently in the ER for acute physical problems. The consultative examiner's report, by comparison to that of Dr. Reed, provides a much greater amount of objective medical detail, and I afford it greater weight. The medical record as a whole also supports a conclusion that she can perform light work, given that she has been treated only conservatively, she has not taken regular medication, and she has continued to engage in some limited activities such as cooking, as well as care of her mother.

(Tr. 21-22) Citing the well known rule that more weight is generally given the opinions of treating physicians than the opinions of physicians who do not count the claimant among their patients, and noting the disparity between the assessments of Drs. Gomez and Reed, plaintiff argues that the reasons given by the ALJ in the above analysis are not legally sufficient.

In particular, plaintiff points to the fact that the opinion of Dr. Gomez does not account for evidence of the worsening of plaintiff's knee, shoulder, and lower back

conditions post the February 2003 consultative examination date. However, the ALJ's decision does not reflect the unqualified adoption of Dr. Gomez's assessment as the ALJ's own, without regard to the record evidence that postdates it. Rather, leading up to his determination that plaintiff's RFC was at all relevant times consistent with the opinions of Dr. Gomez and the nonexamining consultant, the ALJ took stock of the evidence of worsening cited by plaintiff: "While later found to have fibula fracture and shoulder impingement in November 2004, and disc herniation in February 2005, these impairments have been addressed conservatively" (Tr. 19); "...x-rays obtained by Dr. Terry in November 2004 reflected advanced arthritis[,] [y]et the claimant retains adequate muscle strength and she has not had physical therapy or pain management treatment." (Tr. 21) Thus, the ALJ properly considered the evidence of developments subsequent to the date that plaintiff was examined by Dr. Gomez, and concluded that such developments did not significantly undermine the findings and assessments of Dr. Gomez and the nonexamining consultant in February-March 2003. Furthermore, regarding plaintiff's worsening left shoulder impairment, the ALJ's determination of plaintiff's RFC includes the assignment of a limitation on reaching "[i]n light of her recent treatment for possible tendonitis...." Id. Because the ALJ accounted for the medical evidence postdating Dr. Gomez's assessment (imposing a work-related limitation not assessed by that physician, to boot), the undersigned finds that plaintiff's argument here -- that the ALJ assumed her physical impairments remained the same after the examination by Dr. Gomez -- lacks merit.

        Plaintiff next faults the ALJ for citing Dr. Reed's failure to further document the severity or frequency of plaintiff's symptoms, arguing that any perceived deficiency in

14

this regard should have led the ALJ to recontact Dr. Reed for clarification. The cited regulation governing "[r]econtacting medical sources," 20 C.F.R. § 404.1512(e), provides that such efforts will be made "[w]hen the evidence we receive from your treating physician ... is inadequate for us to determine whether you are disabled," i.e., " ... when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e), (e)(1). However, this regulatory provision appears to define the antecedent duty of the Administration in developing a full and fair medical record, prior to issuing any decision adverse to the claimant. See 20 C.F.R. § 404.1512(d). Such concerns would not appear to be implicated by the ALJ's consideration of a detailed medical source statement that counsel has tailored to plaintiff's claim (Tr. 311-14). Upon considering the relative weight of the medical opinions of record, the Administration is obliged to recontact a medical source or to obtain a consultative evaluation only "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled...." 20 C.F.R. § 404.1527(c)(3). As defendant points out, the ALJ plainly did not consider the evidence of record to be insufficient to support a conclusion on the issue of disability. Therefore, he was not under any affirmative obligation to consult another medical expert or to recontact Dr. Reed prior to weighing that physician's notation of plaintiff's clinical findings then on display (i.e., "3+ pitting edema BLE, obese, crepitus, bulging disks") (Tr. 311), and finding that this mere reference without further explanation comes up short in terms of supporting the case for disabling limitations.

15

Plaintiff further argues that the ALJ played doctor when he assumed, without support from the record, that the clinical findings cited in Dr. Reed's report were intermittent or transitory. However, rather than make any finding that suggests reliance on his own, layman's judgment of plaintiff's medical condition in 2004 and beyond, the ALJ properly looked to "[t]he medical record as a whole," in addition to the findings and assessment of the consultative examiner in 2003, as "support[ing] a conclusion that she can perform light work, given that she has been treated only conservatively, she has not taken regular medication, and she has continued to engage in some limited activities such as cooking, as well as care of her mother." (Tr. 21-22) The undersigned finds no support for plaintiff's argument.

(2)

With regard to the ALJ's assessment of plaintiff's credibility "to be only fair at best" and his predicate finding that, despite the existence of objectively established underlying impairments that may reasonably be expected to produce her alleged symptoms, she had been inconsistent in her efforts to seek treatment prior to June 2004 (Tr. 20), plaintiff argues that her inability to afford treatment while uninsured was not adequately evaluated by the ALJ. Plaintiff points to three agency forms submitted in support of her initial application (Tr. 103, 106) and her request for reconsideration (Tr. 112) as showing that her lack of health insurance kept her from pursuing the treatment that she needed. However, it is difficult to fault the ALJ for his failure to expressly consider this factor when it was only raised in agency paperwork prior to the hearing level, and not argued for his benefit in a hearing brief or at the hearing itself. Even with the benefit of counsel's

16

argument, the record must truly be combed for indications of plaintiff's uninsured status prior to 2004, such as internal hospital records listing the payor on plaintiff's account as "private pay" (compare Tr. 167 and 179 with Tr. 191); perhaps plaintiff's statement accompanying her request for an ALJ hearing, in which she acknowledged that she saw Dr. Reed "when I have the money" (Tr. 116); and perhaps a greater than average subsidy from Dr. Reed's office in the form of samples of Avandamet and Prozac (Tr. 291). While an ALJ assessing credibility is charged with a clear duty when confronted with a claimant's significant lapse in medical treatment,[4] and while the ALJ in this case certainly held plaintiff's failure to consistently pursue treatment or take pain medications against her, the undersigned must conclude from the presentation of this case and the otherwise substantial evidence supporting the ALJ's adverse credibility finding that any error here is harmless. Other factors cited by the ALJ as support for his credibility determination are as follows:

> She testified that she injured her left shoulder 16 or 17 years ago. She was able to perform work as a cashier and factory assembler despite this condition, and she stopped working in the factory on her own volition and not due to specific injury. ... She has been treated conservatively at all relevant times, even after fracturing her fibula last November. She was treated for exacerbation of back pain in the ER on December 21, 2004, however the ER report reflects that she was lifting boxes at that time (Exhibit 16F, p. 6). When questioned by the

---

[4]Social Security Ruling 96-7p, cited by plaintiff, states that "...the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. ... The explanations provided by the individual may provide insight into the individual's credibility. For example: ... The individual may be unable to afford treatment and may not have access to free or low-cost medical services." 1996 WL 374186, at *7-8 (S.S.A. July 2, 1996). Though unclear from the record, it appears that prior to June 2004 when she was enrolled in state-sponsored health care, plaintiff last had insurance through her employer in 2001, when she worked at Delmet Corporation (Tr. 90, 191).

17

>
> undersigned, however, she denied having previously lifted boxes. She stated that she can not lift anything and she testified that her husband does everything around the house, yet she later acknowledged that he is on disability for back impairment, heart disease and diabetes. ... The claimant reports very restricted ability to walk and sit, yet she has not been treated for radicular-type symptoms and does not use a cane or assistive device. She reports severe depression but has never had mental health counseling. She cooks meals for her family and she previously acknowledged caring for her mother (Exhibit 5F).

(Tr. 20-21)

The credibility finding of the ALJ, who observed plaintiff while she testified at the hearing, is deserving of "great weight and deference" and thus may only be set aside if unreasonable or lacking in substantial evidentiary support. <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 476 (6th Cir. 2003). The foregoing rationale behind the credibility determination in this case is indeed reasonable and based on substantial record evidence. Plaintiff argues that the ALJ's citation to her limited daily activities was unreasonable, as such activities have been shown by "overwhelming evidence" to be sustainable only when interspersed with periods of rest. (Docket Entry No. 24 at 4-5 (<u>citing</u> Tr. 101, 434-35)). With all due respect, the undersigned does not find the cited evidence of plaintiff's inability to sustain activity to be overwhelming. The evidence does confirm plaintiff's report; indeed, plaintiff essentially testified to needing to remain in a reclined position with her feet elevated for the greater part of each day. The problem is that the ALJ simply did not believe this testimony, and supported his disbelief by citing to evidence which appears to show plaintiff's lack of candor while testifying (Tr. 20, 326-27, 441-42), as well as evidence that plaintiff had no neurologic deficits, no appreciable muscle strength deficit, and no muscle atrophy (Tr. 21, 200, 281-82).

18

The undersigned finds no error in this determination by the ALJ.

Finally, plaintiff argues that the ALJ failed to adequately consider her drowsiness as a medication side effect limiting her ability to perform work activity. The ALJ did note plaintiff's testimony to this side effect (Tr. 20, 440). However, plaintiff further testified that her drowsiness was such that she would doze off "every now and then" while watching television in her recliner (Tr. 440). Respectfully, the undersigned finds that the ALJ gave this alleged side effect all the attention it was due.

In sum, the decision of the ALJ is supported by substantial evidence on the record as a whole, is free from legal error, and thus deserves to be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 31st day of October, 2008.

                                              s/ John S. Bryant
                                              JOHN S. BRYANT
                                              UNITED STATES MAGISTRATE JUDGE